

# In the Missouri Court of Appeals

## Eastern District

DIVISION THREE

| | | |
|---|---|---|
| EDWIN J. FORBUSH, | ) | No. ED101290 |
| | ) | |
| Respondent/Cross-Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Hon. Steven H. Goldman |
| STEPHEN S. ADAMS, III, AS TRUSTEE | ) | |
| OF THE STEPHEN S. ADAMS, III | ) | |
| REVOCABLE TRUST U/T/A DATED | ) | |
| OCTOBER 9, 2001, | ) | |
| | ) | Filed: |
| Appellant/Cross-Respondent. | ) | November 25, 2014 |

Stephen S. Adams, III, as Trustee of the Stephen S. Adams, III Revocable Trust ("Adams"), appeals from the trial court's grant of summary judgment. Edwin Forbush ("Forbush") cross-appeals. We affirm in part and reverse and remand in part.

Stephen S. Adams, III, is an individual residing in California and is the trustee of the Adams Trust. Forbush and Adams are the sole owners of Midtown Partners and Associates, Inc. ("Midtown"), a Missouri corporation. Forbush owns 510 shares of common stock representing a 51% ownership interest in Midtown, and Adams owns 490 shares representing a 49% ownership interest. Midtown was formed for the purpose of acquiring a Harley-Davidson dealership. In October of 2007, Midtown acquired the Fairfield Cycle Center ("Fairfield"), a Harley-Davidson dealership in Vacaville, California.

In 2009 and 2010, Forbush made multiple term loans to Midtown. From 2009 to 2011, Adams also made term loans to Midtown. Forbush and Adams have also caused Midtown and Fairfield to borrow money from both the Private Bank of St. Louis and Harley-Davidson to finance the operation of Fairfield. As of December of 2013, the outstanding balances on the terms loans Forbush made to Midtown were approximately $1,275,000, and the outstanding balances on the loans Adams made to Midtown were approximately $57,000. Substantial loans also remain with the Private Bank of St. Louis, and the terms of those loans prohibit the payment by Midtown and Fairfield of subordinate loans like those of Forbush and Adams without the consent of the Private Bank of St. Louis.

Midtown is governed by a cross-purchase agreement[1] dated June 18, 2007, which places certain restrictions on the transfer of any shares of common stock in Midtown. The cross-purchase agreement provides that after three years, either shareholder may make an offer to purchase the shares of common stock owned by the other shareholder upon the "terms and conditions and at the price" set forth in a written offer. When such an offer to purchase is made, the offeree must either accept the offer or must purchase the offeror's stock at the same price and on the same terms and conditions as in the offeror's offer.

On June 25, 2013, Forbush elected to exercise the Texas Shootout Provision by delivering a written offer letter and stock purchase and sale agreement to Adams, offering to purchase Adams's stock for $100 per share with the following conditions: Forbush shall repay all of the outstanding balance of the voluntary loans made by Adams; Forbush shall release or indemnify Adams from any personal guarantees of company debt in accordance with Section 9.19 of the cross-purchase agreement; Forbush shall provide Harley-Davidson with written

---

[1] The cross-purchase agreement includes a Russian Roulette (aka Texas Shootout) Provision. We will refer to it as the Texas Shootout Provision.

2

notice and a complete explanation of the proposed stock transfer and change in ownership of the company and obtain the prior written approval from Harley-Davidson for the stock transfer and ownership change pursuant to the general conditions of the dealer contract; Forbush shall provide Adams a one-year consulting agreement; Forbush shall be entitled to approve company expenditures requested by Adams between the date of the offer and the closing date, which approval shall not be reasonably withheld; and a failure or refusal to respond to Forbush's offer shall constitute an acceptance of the offer.

On July 12, 2013, Adams sent a letter purporting to respond to Forbush's offer. The letter stated Adams elected to buy Forbush's stock at the price of $100 per share. But Adams refused to pay the voluntary loans made by Forbush and claimed Forbush's proposed purchase and sale agreement adds additional terms and conditions contrary to the cross-purchase agreement.

Forbush subsequently filed a petition for declaratory judgment against Adams. Forbush claimed the cross-purchase agreement created a valid contractual obligation requiring Adams to either accept Forbush's offer or purchase Forbush's stock at the purchase price and on the same terms and conditions as contained in Forbush's offer. Thus, Forbush requested that the trial court declare his offer to Adams was valid and enforceable under the cross-purchase agreement. Further, Forbush requested a declaration that Adams's attempt to vary the terms of the offer constitutes a failure to respond to the offer. In the alternative, Forbush requested that if the court finds the repayment of the voluntary loans or any other material term or condition in the offer is invalid or unenforceable, the court should declare the offer is null and void in its entirety. Forbush also requested attorney fees, costs, and expenses as the prevailing party.

3

Adams then filed an answer and a counterclaim for declaratory relief. In his counterclaim, Adams argued, among other things, that the "terms and conditions" language in the Texas Shootout Provision relates only to the purchase price of the stock and not to extraneous matters like personal loans and consulting agreements. Adams requested that the court declare Forbush's offer is valid to the extent it contains terms offering to purchase Adams's stock at a designated price, but that the additional consideration requiring company repayment of debt and a consulting agreement are not comprehended by a correct reading of the Texas Shootout Provision and must be disregarded. Adams also requests that the trial court declare Adams is the purchaser of Forbush's stock pursuant to the Texas Shootout Provision and that Adams must cause Midtown to cause Fairfield to release or indemnify Forbush from all personal guarantees of the debt of Midtown and Fairfield.

Forbush filed an answer to Adams's counterclaim. Forbush also filed a motion for summary judgment, arguing the terms of the cross-purchase agreement are unequivocal and required Adams to accept the offer or agree to purchase Forbush's shares at the "purchase price and on the same terms and conditions" contained in the offer and his refusal to do so violated the agreement. Thus, Forbush contended the trial court should declare as a matter of law Forbush's offer was consistent with the terms of the cross-purchase agreement and was fully enforceable.

The trial court entered its judgment partially granting summary judgment and finding Forbush's offer included, as a material part, the personal repayment or guaranty of corporate debt to the parties, which was not allowed under the Texas Shootout Provision. As a result, the trial court held Forbush's offer did not trigger the buyout agreement. Therefore, it found Forbush's unaccepted offer was void. The trial court also found because Forbush asked for this relief as an alternative, neither party prevailed and it did not award any attorney fees.

4

Adams then filed a motion to reconsider and clarify the trial court's judgment. In this motion, Adams requested that the trial court award him attorney fees as the prevailing party. Adams also asked for clarification regarding which parts of Forbush's offer were outside the buyout agreement and what effect the judgment had on his counterclaim.

The trial court subsequently issued an amended order and judgment in which it clarified its earlier judgment by stating the following terms were outside the scope of the Texas Shootout Provision of the cross-purchase agreement and unenforceable: (1) requiring a buyer to repay or cause to repay loans advanced by shareholders of the company; (2) requiring a buyer to personally guarantee seller's guarantees of company bank debt; and (3) requiring a buyer to offer seller a consulting agreement. As a result, the trial court concluded Forbush's offer was void in its entirety and Adams had no offer to counter or accept. Thus, the trial court dismissed Adams's counterclaim without prejudice. The trial court also concluded there was no prevailing party and denied any attorney fees. This appeal follows.

Appellate review of a trial court's grant of summary judgment is essentially *de novo*. ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). We will review the record in the light most favorable to the party against whom judgment was entered. Id. We accord the non-movant the benefit of all reasonable inferences from the record. Id. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. Id. We will uphold summary judgment on appeal only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Id.

In his cross-appeal, Forbush argues the trial court erred in determining that the terms and conditions were outside the scope of the cross-purchase agreement and therefore unenforceable

5

in that the Texas Shootout Provision unequivocally provides that a shareholder shall have the right to make an offer to purchase another shareholder's stock upon the terms and conditions and at the price set forth in the offer. In his first point, Adams argues the trial court erred in holding that Adams's acceptance of Forbush's stock purchase offer made under the parties' previously negotiated cross-purchase agreement was of no force and effect because under the contract, Adams should have had the opportunity to accept just that portion of Forbush's offer that did not include additional, extraneous conditions in that those conditions were outside the scope of the Texas Shootout Provision of the cross-purchase agreement. Because both of these points deal with the validity of the offer, we will address them together.

The relevant provision in this case provides as follows:

9.18 <u>Russian Roulette (aka Texas Shootout) Provision</u>. Notwithstanding any provision contained herein to the contrary:

(a)    Any shareholder ("Offeror") shall have the right to make an offer to purchase the shares of Stock owned by any other Shareholder upon the terms and conditions and at the price set forth in the Offeror's offer. The Shareholder receiving the Offeror's offer ("Offeree") must either accept the Offeror's offer or, alternatively, the Offeree must purchase the Offeror's shares of stock within sixty (60) days after receiving the Offeror's offer at a purchase price and on the same terms and conditions contained in the Offeror's offer.

The interpretation of a contract is a question of law. <u>Systemaire, Inc. v. St. Charles County</u>, 432 S.W.3d 783, 787 (Mo. App. E.D. 2014). The cardinal rule of contract interpretation is to ascertain the parties' intentions and to give effect to that intention. <u>Id</u>. Intent is to be determined from the contract alone and not based on extrinsic or parol evidence, unless the contract is ambiguous. <u>Id</u>. The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning. <u>Lehmann v. Bank of America, N.A.</u>, 427 S.W.3d 315, 320 (Mo. App. E.D. 2014).

6

The issue here is how to construe the phrase "upon the terms and conditions and at the price set forth in the Offeror's offer," which appears in the Texas Shootout Provision. Adams contends that the phrase "terms and conditions" means payment terms, terms related to security if a promissory note were contemplated, representations about the seller's good title, and when the closing of the transaction would occur. Forbush maintains there is no reason to restrict the meaning of "terms and conditions" in this manner, and the trial court erred by stating the following terms were outside the scope of the shootout provision of the cross purchase agreement and unenforceable: (1) requiring a buyer [Forbush] to repay or cause to repay loans advanced by shareholders of the company; (2) requiring a buyer [Forbush] to personally guarantee seller's [Adams] guarantees of company bank debt; and (3) requiring a buyer [Forbush] to offer seller [Adams] a consulting agreement.[2]

First, we note that the phrase "terms and conditions" is being interpreted as part of the Texas Shootout Provision. Thus, in reading the contract as a whole and giving the terms their ordinary and usual meaning, we must first look at the general intent of the Texas Shootout Provision.

Closely-held business ventures often contain buy-sell provisions in their operating agreements. These provisions provide an exit mechanism for owners who no longer wish to participate in the business venture. One method of providing this exit mechanism is through a so-called Texas Shootout Provision, where one owner names a price and the other owner is compelled to either purchase the first owner's shares or sell his own shares at the named price. Richard R.W. Brooks, Claudia M. Landeo, and Kathryn E. Spier, Trigger Happy or Gun Shy?

---

[2] We note both Forbush and Adams rely on cases from other jurisdictions to support their construction of the phrase "terms and conditions." However, as recognized by the parties, those cases are not controlling authority. Further, because we are interpreting a unique contract here, we decline to rely on the construction courts in other jurisdictions have given to provisions in other contracts. We also note there are no Missouri cases dealing with a similar provision.

Dissolving Common-Value Partnerships with Texas Shootouts, 41 RAND J Econ 649 (2010). Because the person naming the price can be forced to either buy or sell, he or she must act honestly. Id. at 650.

Texas Shootout Provisions have been described as follows:

when two parties enter a joint venture, they recognize that, at some point, one or the other will want to terminate the arrangement. When neither faces any liquidity constraints and both are equally able to run the business, they may agree at the outset that as soon as one of them wants to terminate the venture, she can put a value on the business and the other has the choice to buy or sell the business at this price. This way of dissolving a joint venture is called a "Texas Shootout."

Douglas G. Baird and Donald S. Bernstein, Absolute Priority, Valuation Uncertainty, and the Reorganization Bargain, 115 Yale Law Journal 1930, 1953 (June, 2006). As can be seen from these descriptions, Texas Shootout Provisions are intended to provide a fair method of valuing the stock so that a joint venture can be discontinued. Their general purpose does not necessarily include winding up and separating all of the parties' business entanglements, but rather they are merely a means to ensure the parties are able to come up with a fair buyout price in an expedient manner.

Thus, recognizing that Texas Shootout Provisions generally are focused on price, the next question is whether the particular provision in this case is meant to be construed differently. In other words, does the Texas Shootout Provision's reference to "terms and conditions" indicate it can encompass "terms and conditions" unrelated to the price? The cross-purchase agreement in this case does not support such a construction. The very next provision after the Texas Shootout Provision in the cross-purchase agreement deals with personal guaranties of corporate obligations. It provides:

9.19 Personal Guaranty of Corporate Obligations. If any Shareholder now or hereafter personally guarantees any corporate obligations or becomes a co-maker of any obligations of any of the Corporations indebtedness, then prior to Closing

8

the Corporation shall take reasonable steps to relieve such Transferring Shareholder from said obligations and personal guarantys by either renegotiating said obligations, or, failing this after a good faith effort, executing a written instrument thereby agreeing to indemnify and hold harmless such Transferring Shareholder, his or her heirs, successors and assigns.

Thus, the cross-purchase agreement contemplates that when one shareholder is transferring his shares, the parties might have other entanglements such as loans and guarantees. Section 9.19 ensures those obligations would be satisfied.

Because Texas Shootout Provisions are focused on setting a fair buyout price and nothing in the cross-purchase agreement indicated the Texas Shootout Provision in this case was meant to encompass anything beyond that, we find the additional terms and conditions in Forbush's offer were not contemplated by the Texas Shootout Provision. Therefore, Forbush submitted a non-conforming offer to Adams when he offered to purchase Adams's stock for $100 per share with the following conditions: Forbush shall repay all of the outstanding balance of the voluntary loans made by Adams; Forbush shall release or indemnify Adams from any personal guarantees of company debt in accordance with Section 9.19 of the cross purchase agreement; Forbush shall provide Harley-Davidson with written notice and a complete explanation of the proposed stock transfer and change in ownership of the company and obtain the prior written approval from Harley-Davidson for the stock transfer and ownership change pursuant to the general conditions to the dealer contract; Forbush shall provide Adams a one-year consulting agreement; Forbush shall be entitled to approve company expenditures requested by Adams between the date of the offer and the closing date, which approval shall not be reasonably withheld; and a failure or refusal to respond to Forbush's offer shall constitute an acceptance of the offer.

Although Forbush's offer did not conform to the dictates of the Texas Shootout Provision and thus, did not trigger such provision, Adams could have, nonetheless, accepted the non-conforming offer. As a result, the offer was not void as the trial court found. The parties need not be confined to the dictates of the Texas Shootout Provision in winding up their business.

However, having concluded that Forbush's offer was non-conforming, but not void, we must determine the effect of Adams's purported acceptance. While Adams responded to Forbush's offer, his response attempted to alter the terms and conditions of the offer by simply excluding them. If a purported acceptance adds or alters the terms of the proposition made, neither party is bound. Londoff v. Conrad, 749 S.W.2d 463, 465 (Mo. App. E.D. 1988). Where the purported acceptance introduces new or variant terms, the purported acceptance amounts to a counteroffer and rejection of the original offer. Id. Thus, Adams's offer to buy Forbush's stock was a valid counteroffer, but, being a counteroffer, was also not in conformance with the Texas Shootout Provision. Forbush could have accepted or rejected the counteroffer without obligation under the Texas Shootout Provision. However, Forbush did neither; Adams's counteroffer was set for a closing on August 23, 2013, and that closing did not take place. As a result, Adams's counteroffer has expired.

Thus, neither party exercised its rights under the Texas Shootout Provision, and there are no open offers from either party. The trial court did not err in determining that the terms and conditions unrelated to the price were outside the scope of the Texas Shootout Provision of the cross-purchase agreement. Further, the trial court did not err in holding that Adams's purported acceptance of Forbush's stock purchase offer was of no force and effect. As noted above, Adams did not actually accept Forbush's offer, but rather offered a counteroffer that expired without being accepted. Points denied.

In his second point, Adams argues the trial court erred in declaring that "in the event Harley Davidson does not approve either of the parties as a buyer, a Court could determine whether an alternative condition is reasonable in terms of the Shootout Provision" because the approval of Harley-Davidson is an extraneous condition that should have been listed in the Amended Order as a condition outside the scope of the Shootout Provision and because the declaration falls outside the scope of the declaratory judgment act in that it does not address a present controversy, does not provide the parties any relief from their legal uncertainty and does not establish the rights and duties of the parties.

Having found above that only terms and conditions related to price were proper under the Texas Shootout Provision, we find the trial court should have listed the approval of Harley-Davidson as an extraneous condition in its judgment. Therefore, the trial court erred in including this declaration in its judgment. Point granted.

In his third point, Adams argues the trial court erred in refusing to award attorney fees to Adams because he is the prevailing party in that the trial court ruled against Forbush's primary claim and Forbush cannot rely on inconsistent, diametrically opposed claims in his pleadings as a means to nullify his opponent's contractual right to an attorney fee award. We agree.

Whether a trial court has authority to award attorney's fees is a question of law, which we review de novo. Desu v. Lewis, 427 S.W.3d 843, 844 (Mo. App. E.D. 2014). When a contract provides for payment of attorney's fees and costs expended to enforce the contract, a trial court is required to award such fees and costs to the prevailing party. Id. at 844-45. We have defined a "prevailing party" for purposes of a contractual award as the party prevailing on the main issue in dispute, even though not necessarily to the extent of its original contention. Id.

The cross-purchase agreement provides:

11

9.13 <u>Attorneys' Fees and Related Costs of Litigation</u>. In the event either party shall seek to enforce the terms of this Agreement via litigation, then the non-prevailing party in any such litigation proceedings shall pay all court ordered costs and expenses (including reasonable attorneys' fees) incurred by the prevailing party in connection with the enforcement hereof, at the trial, and appellate levels.

Forbush requested a declaration that his offer was valid and enforceable or, in the alternative, if the court finds the repayment of the voluntary loans or any other material term or condition in the offer is invalid or unenforceable, the court should declare the offer is null and void in its entirety. We have found neither of those possibilities fit the situation here. As noted above, Forbush made a valid offer, but it did not conform to or trigger the Texas Shootout Provision. Thus, Forbush's offer was neither valid and enforceable within the context of the Texas Shootout Provision, nor was it completely invalid or unenforceable. Therefore, we find Forbush did not prevail on his claims here.

On the other hand, Adams claimed he should have had the opportunity to accept just that portion of Forbush's offer relating to the stock price, not including the additional, extraneous conditions. However, Adams's response amounted to a counteroffer, which was not permitted under the Texas Shootout Provision. Thus, it was also not in conformance with the Texas Shootout Provision, and Adams was not permitted to purchase Forbush's stock at the price set by Forbush. However, Adams did succeed in arguing that Forbush's offer included terms and conditions that were extraneous to the Texas Shootout Provision. Thus, we find Adams was the prevailing party.

Therefore, the trial court did not err in determining that the terms and conditions unrelated to the price were outside the scope of the Texas Shootout Provision and that part of the judgment is affirmed. The trial court also did not err in holding that Adams's purported acceptance of Forbush's stock purchase offer was of no force and effect and that part of the

12

judgment is affirmed. The trial court did err in failing to declare the approval of Harley-Davidson was an extraneous condition outside the scope of the Texas Shootout Provision and that part of the judgment is reversed and remanded for such a declaration to be entered. Lastly, we also remand to the trial court for a determination as to the proper amount of Adams's costs and expenses including reasonable attorneys' fees.

ROBERT G. DOWD, JR., Judge

Kurt S. Odenwald, P.J. and
Lawrence E. Mooney, J., concur.